**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.gov/rules**

**July 2, 2026**

# In the Court of Appeals of Georgia

A26A0450. MILLING v. BURNS AND MCDONNELL ENGINEERING COMPANY.

GOBEIL, Judge.

This appeal stems from a personal injury suit appellant Christopher Milling filed against Burns & McDonnell Engineering Co. ("BME") and a BME project manager, Justin Kanitz (collectively referred to as the "defendants"). The trial court granted the defendants' motion for summary judgment, concluding that neither BME nor Kanitz owed a legal duty to Milling, and Milling had failed to establish that BME's actions were the proximate cause of his injuries or that BME had superior knowledge of the hazard that caused Milling's injuries. Milling now appeals from the trial court's grant of summary judgment in favor of BME. For the reasons set forth more fully below, we reverse.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" OCGA § 9-11-56(c). We review the grant of a motion for summary judgment de novo, "view[ing] the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." *Cowart v. Widener*, 287 Ga. 622, 624(1)(a) (697 SE2d 779) (2010).

So viewed, the record shows that in 2021, Milling sustained severe injuries while working as a lineman for nonparty Pike Electric ("Pike"). Nonparty Georgia Power retained Pike to perform work related to the construction and integration of a new electrical bay ("Bay 4") at Old National substation. BME provided program management services to Georgia Power in connection with its wide-ranging Grid Investment Program, including managing the construction at the substation. Specifically, in January 2020, BME entered into a Master Contract for Program Management Services (the "MC") with Southern Company (Georgia Power's parent company). The MC set out that "[e]ach Other contractor shall remain solely responsible for ensuring the safety of its employees, subcontractors, and works."

BME also agreed to "review the safety programs developed by each of the Other Contractors for purposes of coordinating the safety programs with those of the Other Contractors." As part of its program management responsibilities, BME agreed to "[m]anage[ ] the coordination of all [power] outage activity," including developing and directing outage planners on outage sequence and planning. The MC authorized BME to perform work pursuant only to an executed authorization, and the parties executed a service order regarding Program Management Services for the Grid Investment Program (the "Service Order").

BME compiled a Program Execution Plan ("PEP") for the Grid Investment Program that sets forth several relevant provisions. As to service authorizations, the PEP described that BME's program manager will review new project scopes and prepare a recommendation to Georgia Power for the design-build ("DB") contractor assignments. With respect to outage planning and management, the PEP described BME's role as working with Georgia Power and DB contractors to address any concerns before proceeding with a final outage sequence plan and ensure that the plans are vetted. BME also was authorized to accompany construction teams to job sites to inspect and plan outage work.

Pike entered into its own Master Contract with Southern Company for "Design/Build Services for the Grid Investment Program" (the "Pike MC"). Pike's role in the project was the DB contractor to design and construct Bay 4 at the substation. The Pike MC provided that Pike was "solely responsible for the safe performance of all Work, [and Southern Company] is not responsible for the physical condition or safety of a Work Site."

BME prepared a "Final Scoping Report" ("FSR") that identified the equipment to be de-energized during the course of the Old National Substation project. The outage management/reliability section of the FSR listed two days of outages at three of the four bays. A November 2021 Outage Plan for the Old National project indicated that three existing feeders at the substation would remain connected to transmission metering potential transformers.

On the day of his injury, November 16, 2021, Milling was working to install and align Bay 4 into the substation. Milling's foreman, Greg Taylor, a Pike employee, informed Milling that the area in which his crew would be working was de-energized. While working near an energized feeder protruding from an existing bay ("Bay 3"),

Milling suffered severe injuries when his measuring equipment made contact with the feeder.

Milling filed suit against the defendants, asserting in pertinent part that BME's conduct was the proximate cause of his injuries. Specifically, he alleged that the defendants negligently approved and/or failed to detect deficiencies in an electrical outage plan that left energized equipment too close to Pike's active work zone. The defendants filed motions for summary judgment, primarily on the grounds that they did not owe a duty of care to Milling, and under the terms of the MC, BME was not responsible for the safety of contractors' workers.

Following a hearing, the trial court granted summary judgment to the defendants, concluding that BME did not owe Milling a duty under either common law or by virtue of its contract with Southern Company, as Milling was not a third-party beneficiary under the MC. As to Kanitz, the court concluded that he was not liable for Milling's injuries because Milling failed to offer evidence to controvert Kanitz's testimony that Kanitz had no specific responsibilities related to the Old National project.[1] The trial court also found that Milling could not show proximate

---

[1] Milling does not challenge the grant of summary judgment in favor of Kanitz, and he is not a party to the instant appeal.

cause because the defendants did not create, energize, or maintain the energized feeder that injured Milling. According to the court, any failure by Pike to ensure a safe work environment was not attributable to the defendants and broke any causal chain. In addition, the trial court found that Milling had equal or superior knowledge of the hazard based on his years of experience working as a lineman at other substations. Finally, the trial court declined to consider post-incident "lessons learned" evidence, finding that Milling failed to satisfy any of the exceptions to the rule that evidence of subsequent remedial measures is generally inadmissible to prove negligence. This appeal followed.

1. First, Milling argues that the trial court erred by concluding that BME did not owe him a legal duty.

(a) Specifically, Milling contends that BME owed a duty of reasonable care to other contractors working on the Old National substation

> In order to have a viable negligence action, a plaintiff must satisfy the elements of the tort, namely, the existence of a duty on the part of the defendant, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of the duty. A legal duty can arise by statute or by common law; however, ... there is no general duty

to all the world not to subject others to an unreasonable risk of harm. The existence of a legal duty is a question of law for the court.

*Emory Healthcare v. Harms*, ___ Ga. App. ___, ___(1)(b)(ii) (928 SE2d 228) (2026) (citation modified).

As relevant here, this Court has said "[w]here two or more independent contractors, or a general contractor and one or more subcontractors, are engaged in work on the same premises, it is the duty of each contractor, in prosecuting his work, to use ordinary and reasonable care not to cause injuries to the servants of another contractor." *Doke v. Dover Elevator Co.*, 152 Ga. App. 434, 436 (263 SE2d 209) (1979). The trial court acknowledged this proposition, but reasoned that Milling had attempted to apply it too broadly. Specifically, the trial court interpreted *Doke* as describing that such a duty only arises in another independent contractor where the circumstances give rise to that duty. According to Milling, Pike and BME were working contemporaneously toward a common end — completing the outage coordination necessary for construction at the substation — and BME was therefore required to exercise ordinary care in safeguarding Pike's employees. BME counters that the duty to exercise such ordinary care extends only to the scope of work the

7

independent contractor actually performed. Specifically, BME points to the MC and the Service Order authorizing Pike's work, and argues that BME was not obligated to determine where Pike workers would be present or whether they would attempt to take measurements outside the minimum clearance. BME argues that the only duties it can owe "with respect to 'prosecuting its work' are those it contractually agreed to" in the MC.

We agree with the trial court that, where subcontractors are engaged in work at the same premises, the existence of subcontractors' duties to one another is not without limit. See *Adcox Serv. Co. v. Adderhold*, 210 Ga. App. 39, 40-41 (435 SE2d 262) (1993) (a contractor or subcontractor's duty to use ordinary care not to cause injuries to others engaged in work on the same premises is limited to the scope of work the independent contractor actually performed). And, like the trial court, we are skeptical of attempts to read *Doke* too broadly. That said, we agree with Milling that the MC and service order do not abrogate BME's common law duty based on the work it actually performed. Here, the relevant inquiry is BME's engagement in the project at the time of Milling's injury, not merely the limitations set forth in the

8

parties' contract. Furthermore, the existence of BME's duty to Milling here does not hinge on its ability to control Pike's work. *Doke*, 152 Ga. App. at 435-36.

Under the particular facts of this case, we hold that BME owed a duty to Milling. Specifically, BME's wide-ranging responsibilities in this project included planning, project management, oversight, and coordination. And significantly, such responsibilities specifically included some concerning power outage activity. The "prosecution of its work" in these roles directly relates to Milling's allegations of negligence regarding BME's approving the outage plan, which omitted the deactivation of the feeder in Bay 3. No Pike employee or representative was present at the meeting determining the project's scope, and the revisions to the scoping plan as memorialized in the FSR — including the outages required to accomplish the break feeder addition — were signed off on by BME representatives. And there is nothing in the record to suggest that Pike could have unilaterally deactivated the feeder without coordinating with BME.

Under these circumstances, we find that — confined to the specific scope of work BME actually performed — the holding in *Doke* applies here. Accordingly, the trial court erred by concluding that BME owed no duty of care to Milling in the

prosecution of its work in overseeing and coordinating with Pike regarding the outage plan. See *Mullinax v. Pilgrim's Pride Corp.*, 354 Ga. App. 186, 191-94(2)(a) (840 SE2d 666) (2020) (concluding that chicken subcontractor — which was engaged in work on same premises as trucking contractor that employed decedent — owed decedent a duty of ordinary care, even though trucking contractor's employee's operation of forklift was immediate cause of decedent's death); *Baker v. Harcon*, 303 Ga. App. 749, 751-52(a) (694 SE2d 673) (2010) ("[u]nquestionably, a building subcontractor has a duty to exercise ordinary care not to cause injuries to others engaged in work on the same premises"); *Ragsdale Heating & Air Conditioning v. Terrell*, 245 Ga. App. 866, 866-67 (539 SE2d 199) (2000) (defendant subcontractor owed plaintiff subcontractor duty to exercise reasonable care to ensure plaintiff's safety while working in vicinity of heating and air vents that caused plaintiff's injuries). Accordingly, we reverse the trial court's ruling that BME did not owe Milling a duty of reasonable care.

(b) In light of our holding in Division 1(a), supra, we need not address Milling's alternative argument that by voluntarily undertaking safety oversight, BME assumed a duty or created reliance.

2. Milling next contends that the trial court's grant of summary judgment on the issue of proximate cause was erroneous because Pike's conduct and Milling's injuries were both foreseeable consequences of BME's negligence.

"Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Johnson v. Avis Rent A Car System*, 311 Ga. 588, 592 (858 SE2d 23) (2021). Whether an intervening act renders an injury too remote depends on a question of foreseeability, or, in other words, whether "the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer[.]" Id. at 593. The fact that an intervening act amounts to negligence does not make it ipso facto unforeseeable. See *Mullinax*, 354 Ga. App. at 192-193(2)(b) ("[c]learly there can be more than one proximate cause of an accident"). Finally, "[l]ike the failure to exercise ordinary care, questions of proximate cause and whose negligence constituted the proximate cause of the plaintiff's injuries are, except in

11

plain, palpable and indisputable cases, solely for the jury." Id. at 193(2)(b) (punctuation omitted).

In large part, Milling contends the trial court erred by treating Pike's negligence (in selecting inadequate clearance points and directing Milling's work on the date of his injury) as a superseding cause that broke the causal chain. According to Milling, BME knew, or should have known, that Pike had a history of safety violations, and nothing about Pike's conduct was extraordinary or disconnected from the risks BME's own oversight created. Here, there is evidence that Pike had thirteen OSHA incidents in the five years preceding the incident giving rise to Milling's injury. In addition, Milling testified that his supervisor, Taylor, did not inform him that the feeder line was energized. However, there is also evidence that BME's responsibilities on the project included coordinating with DB contractors such as Pike to vet outage sequence plans and "[w]ork compliance with DB Contractor Safety Plan[s]." The specific work request with the allegedly inadequate clearance points and outages was transmitted by Pike to BME and approved.

Given the foregoing, although BME may ultimately be able to show that Pike was negligent, we agree with Milling that, viewing the evidence in the light most

favorable to him as the non-movant, as we must on a motion for summary judgment, there are genuine issues of material fact remaining as to whether Pike's or BME's alleged acts of negligence were the proximate cause of Milling's injuries. See *Mullinax*, 354 Ga. App. at 192-193(2)(a) (reversing grant of summary judgment to chicken subcontractor who contracted to catch and load chickens for transport; decedent was killed when trucking contractor's employee negligently backed forklift over decedent, but issues of fact remained because chicken subcontractor was at least one proximate cause of decedent's death — even though trucking contractor's employee had negligently left forklift running, chicken subcontractor had reason to foresee/anticipate incident based on knowledge of prior incident where trucking employee had used forklift without authority); *Ga. State Fin. & Inv. Commn. v. XL Specialty Ins. Co.*, 303 Ga. App. 540, 544-47(2) (694 SE2d 193) (2010) (reversing grant of summary judgment to chicken subcontractor where there was evidence from which the jury could infer that subcontractor had installed ceiling incorrectly even though cause of ceiling failing may have been the result of the improper work of subsequent subcontractors); *Coweta County v. Adams*, 221 Ga. App. 868, 870-71(2) (473 SE2d 558) (1996) (affirming denial of summary judgment and finding that proximate cause

was jury question; issue of whether the combined negligence of the county and another party was factual issue).

3. Milling also argues that the trial court erred by concluding that he possessed equal or superior knowledge of the hazardous state of the energized equipment. We agree that this issue is best left to the jury.

Although issues of equal and superior knowledge are most often discussed in the context of premises liability, see *Ga. Power v. Ries*, ___ Ga. App. ___, ___(1)(b)(i) (928 SE2d 447) (2026), Milling's equal or superior knowledge of the hazard is relevant here because "[f]ull knowledge by the independent contractor of the dangers should and will be held to discharge the landowner's alternative duty to warn the employees." *McKinney v. Regents of Univ. Sys. of Ga.*, 284 Ga. App. 250, 252(1) (643 SE2d 736) (2007) (affirming grant of summary judgment to defendants — including contractor and subcontractor — and holding that any duty defendants had to warn plaintiff about buried electrical line or to install warning tape above line was satisfied by notice to and acknowledgment by the plaintiff's supervisor of the hazard).

"Although the issue of plaintiff's exercise of due diligence for his own safety is ordinarily reserved for the jury, it may be summarily adjudicated where the

plaintiff's knowledge of the risk is clear and palpable." *Soucy v. Alexander*, 172 Ga. App. 501, 502 (323 SE2d 662) (1984). The evidence here is not so plain as to remove the issue from jury consideration. In his deposition, Pike Foreman Taylor testified that he did not know what equipment was energized, only that he knew the equipment his crew was supposed to work on was de-energized. Milling also testified that Taylor informed him that "everything that's in your guys' work space has already been tested and de-energized, so you have nothing to worry about." Although Milling stated that in working on prior substations, he had tested for voltage before beginning working, he did not test for voltage on the date he was injured because he had already been informed that the equipment was safe. Under these circumstances, it is not unreasonable to conclude that Milling was unaware that the feeder cable was energized such that it created a hazard, and his knowledge of the risk is therefore not clear and palpable. See *Ragsdale Heating & Air Conditioning*, 245 Ga. App. at 866-67 (affirming denial of summary judgment to defendant subcontractor where genuine issue of material fact existed regarding plaintiff subcontractor's knowledge of vent hole into which he fell and whether he failed to exercise due diligence for his own safety).

4. Finally, Milling challenges the trial court's decision excluding the "lessons learned" evidence.

> In civil proceedings, when, after an injury or harm, remedial measures are taken to make such injury or harm less likely to recur, evidence of the remedial measures shall not be admissible to prove negligence or culpable conduct .... The provisions of this Code section shall not require the exclusion of evidence of remedial measures when offered for impeachment or for another purpose, including but not limited to, proving ownership, control, or feasibility of precautionary measures, if controverted.

OCGA § 24-4-407. The rule restricting evidence of subsequent remedial measures exists because persons should not be discouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed as an admission that they had been wrongdoers. *Mark v. Agerter*, 332 Ga. App. 879, 881 (775 SE2d 235) (2015) (physical precedent only).

In response to BME's motion for summary judgment, Milling submitted an exhibit entitled, "Old National Lessons Learned List." The document listed various "Functional Areas," described the "Issue/Concern Encountered," stated the "Mitigation Action," and established a "Mitigation Owner." The first Functional

Area listed is "Outage Coordination/Construction," and the Issue/Concern Encountered reads: "Clearances & energized equipment are fully understood, properly marked and barricaded. Clearances should be backed up whenever possible to remove hazards." The Mitigation Action is described as: "Outage plan is fully vetted in respect to safety by Pike [and BME]. Review of construction execution to be reviewed on the construction kickoff meeting by Pike, [BME], and [Georgia Power]." The Mitigation Owners for this issue are Pike and BME.

Milling argues that the disputed evidence was offered not to show BME's negligence, but to prove that BME had a supervisory role and responsibility for outage coordination. BME counters that because Milling sought to admit the evidence to prove whether BME "had responsibilities for clearance evaluation, whether it had responsibility for equipment safety evaluation, [and] whether it had a duty or undertaking," such evidence should be excluded because it goes to the ultimate question of BME's negligence. In light of our conclusion in Division 1(a), supra, that BME did owe Milling a duty, we remand this issue for the trial court to reconsider

whether this evidence is admissible for a permitted purpose under OCGA § 24-4-407.

*Judgment reversed and case remanded with direction. Pipkin, J., concurs and Dillard, P. J., concurs in judgment only.*